# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# IN ADMIRALTY

### CASE NO. 20-80136-CIV-ALTMAN

**RYBOVICH BOAT COMPANY, LLC**,

    *Plaintiff,*

**SOUTHERN CROSS BOATWORKS, INC.**,

    *Intervening Plaintiff,*

**DAVID THORNBURN,** *et. al.,*

    *Intervening Plaintiffs,*

**MEGA YACHT REFINISHING, LLC**,

    *Intervening Plaintiff,*

**YACHT CHANDLERS, INC.**,

    *Intervening Plaintiff,*

*v.*

**M/Y *BLUE STAR***, a 1993 model 37.12 meter Keith Marine motor yacht bearing hull identification number PLK00027F293 and registered with the Cayman Islands Shipping Registry as Official Number 723333, her engines, tackle, furniture, furnishings, apparel, appurtenances, personal watercraft, and tenders in rem, **VLADIMIR GUSINSKY a/k/a VLADIMIR GUSINSKI, and SHAKRA HOLDINGS LIMITED**, *in personam,*

    *Defendants.*

_____/

## <u>OMNIBUS ORDER</u>

In this admiralty case, the Plaintiff—a yacht-repair company—has sued the Defendants for hundreds of thousands of dollars in unpaid yacht-repair jobs. Since the lawsuit was filed, the Yacht's captain and crew have intervened, seeking unpaid wages and reimbursement for expenses they advanced on the Yacht's behalf. The parties have agreed to sell the Yacht and to use the proceeds of that sale to pay back the Plaintiffs. But the parties disagree about *how* those proceeds should be distributed—and, in some cases, about how much is owed. And it's this disagreement that forms the basis of the two motions we resolve today.

In the first motion, the Plaintiff—Rybovich Boat Company, LLC—wants summary judgment on (1) its maritime lien against the Yacht, M/Y Blue Star[1] (Count I); and (2) its claim for breach of a maritime contract against the Defendants, Vladimir Gusinsky and Shakra Holdings Limited (Count II). *See* Rybovich Motion for Summary Judgment [ECF No. 11] at 2. Rybovich also wants reimbursement of certain *custodia legis* expenses. Of the *many* interested parties in this case, none has responded (or objected) to Rybovich's motion. *See generally* Docket. And so, after careful review, we **GRANT** that motion.

In the second motion, the Intervening Crew Plaintiffs ask for summary judgment on their claim for a maritime lien—which was meant to secure the Crew's wages, their repatriation costs, and certain necessary expenses they advanced on the Yacht's behalf. Here, the Crew supports only *some* of its requests with concrete evidence. As to these, we **GRANT in part** the Crew's motion. But, as to the rest, the Crew offers little evidence and no small amount of speculation—which is why, as we

---

[1] The "Vessel" or "Yacht."

explain below, we'll **DENY in part** summary judgment and allow the Crew to prove up the amount (and necessity) of these expenses at a bench trial.

## THE FACTS[2]

On a good day, the 143-foot Blue Star might fetch a sales price of over $3 million. *See* Appraisal [ECF No. 95-2] at 2. But the Yacht hasn't had a good day in more than two years—during which it's been languishing in port, waiting for its owners (Gusinsky and Shakra Holdings) to claim it and pay their bills. *See* Rybovich SOF [ECF No. 113] ¶¶ 8–11, 23.

Before the Blue Star (our Yacht) was struggling to stay afloat, it carried a crew of between 7 and 12, *see* Crew SOF [ECF No. 111] ¶ 5, who tended to the Yacht, its two jet skis, and its three tenders: an 18-foot Boston Whaler motorboat; an 18-foot custom motorboat; and a 35-foot Everglades motorboat, *see* Rybovich SOF ¶ 5.

Rybovich operates a boat repair, storage, and marina facility in Palm Beach, Florida. *Id.* ¶¶ 1–2. On May 1, 2019, David Thornburn (the Yacht's captain and manager) hired Rybovich to provide dockage, utilities, and other necessaries for the Yacht and its crew. *Id.* ¶¶ 8–11; *see also* Dockage Agreement [ECF No. 1-2]. Eight times over the next four months, Thornburn authorized Rybovich

---

[2] We'll (mostly) cite to Rybovich's Statement of Material Facts ("Rybovich SOF") [ECF No. 113]. After all, no one has objected to those facts, and it's well-settled that courts may "consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied." FED. R. CIV. P. 56(e)(2) advisory committee's note to 2010 amendment; *see also* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under FED. R. CIV. P. 56 does not apply."). In addition—and only when necessary—we'll rely on the Intervening Crew Plaintiffs' Statement of Material Facts ("Crew SOF") [ECF No. 111] for similar reasons. While the Defendants *did* respond to the Intervening Crew Plaintiffs' Motion for Summary Judgment, *see* Response [ECF No. 117], they *failed* to submit a counter-statement of material facts, *see generally id.* (not containing any counter-statement of material facts). One last thing: We'll disregard the unpleasant fact that the Crew's SOF is contained within the Crew's Motion for Summary Judgment [ECF No. 111]— a clear violation of S.D. FLA. L.R. 56.1(b)(1), which requires that statements of material fact be filed *separately*.

to repair and service the Yacht. Rybovich SOF ¶¶ 12–19. Pursuant to these requests, Rybovich repaired the Vessel's running gear, its generator exhaust, and its bulkhead. *Id.*; *see generally* Work Authorizations [ECF Nos. 1-3; 1-4; 1-5; 1-6; 1-7; 1-8; 1-9; 1-10]. Thornburn repeatedly assured Rybovich's project manager, Craig Simon, that the Vessel's owners would pay Rybovich's accruing bills. *Id.* ¶ 22. But no payment came. And, as the weeks turned into months, Simon began complaining to Thornburn, who responded with the oft-deployed (but rarely fulfilled) promise of an imminent "check in the mail." *See* 8/9/2019 Work Authorization [ECF No. 1-8] at 4 ("With regard to payments the owner is aware and extremely apologetic. He is having banking issues getting money out of Russia . . . . I am hoping I can make some sort of payment this week."). After months of such empty promises—and no paychecks—Rybovich filed this lawsuit in January 2020, by which it hopes to recover the monies (it says) the Defendants owe. *See* Complaint [ECF No. 1] ¶¶ 23–27.

But Rybovich isn't the only party that has come to collect. The Blue Star's Crew[3] has intervened in the case, *see* Intervening Crew Complaint ("Crew Complaint") [ECF No. 56], seeking (1) wages (they say) they're owed for work they performed on the Yacht between September 2019 and February 2020, (2) repatriation expenses for two Crew members, and (3) reimbursement for "necessaries" they advanced on the Yacht's behalf, *see* Crew's Motion for Summary Judgment [ECF No. 111] at 3–6.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms,

---

[3] That Crew consists of Captain Thornburn; Bud Morken III (mate); Maria Tuvilla (chief stewardess); Rodilin Hionguin Thornburn (stewardess); Karen Magpantay (stewardess); Frittzie Dumdum (stewardess); Dave Talling (chef); Marco Volschenk (deckhand/dive instructor); Dan Rankin (rotational engineer); Michael Brittenden (rotational engineer); Gregor Tuvilla (rotational deckhand); and Richard Lima (rotational deckhand). Crew SOF ¶ 2; *see generally* Crew Employment Agreements [ECF No. 111-1] at 16–44.

this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## ANALYSIS

### I.  *Custodia Legis* Fees

Typically, "services or property advanced to preserve and maintain the vessel under seizure, furnished upon authority of the court or of an officer of the court should be allowed as *custodia legis* expenses." *Associated Metals & Mins. Corp. v. Alexander's Unity MV*, 41 F.3d 1007, 1018 (5th Cir. 1995) (cleaned up) (quoting *Gen. Elec. Credit & Leasing Corp. v. Drill Ship Mission Expl.*, 668 F.2d 811, 816 (5th Cir. 1982)). Expenses that have preserved a vessel "shall be paid before a general distribution among those entitled to receive" funds from the vessel's sale. *The Poznan*, 274 U.S. 117, 121–22 (1927) ("It is defraying from the proceeds of the ship in its registry an expense which it has permitted for the common benefit and which, in equity and good conscience, should be satisfied before the libelants may enjoy the fruits of their liens."); *see also Staats v. M/Y Perseverance II*, 2017 WL 7796314, at *2 (S.D. Fla. May 17, 2017) ("It is well-settled that the expenses incurred in operating and caring for a vessel while in the custody of the court are considered 'expenses of justice' to be reimbursed from the proceeds of the sale of an arrested vessel." (quoting *Donald D. Forscht Assocs., Inc. v. Transamerica ICS Inc.*, 821 F.2d 1556, 1561–62 (11th Cir. 1987))); *cf. Drill Ship Mission Expl.*, 668 F.2d at 815 ("While it is preferable to secure a court order authorizing this expense before incurring it, nevertheless even in

the absence of court order these 'custodia legis expenses' may be ordered by the court to be paid in priority to the seizing mortgage creditor if 'equity and good conscience' so require." (citing *The Poznan*, 274 U.S. at 122)).

Rybovich says it's owed some $556,961.35 in *custodia legis* expenses, computed as follows: (1) $518,372.81 for custodial services Rybovich provided to the Vessel—as well as its tenders and personal watercraft—from February 25, 2020 (when the Yacht was arrested) through January 22, 2021 (five days before Rybovich filed its motion), *see* Rybovich Motion at 3, 8;[4] (2) $30,088.54 Rybovich paid to remove, store, and insure the Yacht's artwork (through March 31, 2021), *id.* at 3;[5] and (3) $8,500 Rybovich paid to the U.S. Marshal as reimbursement for the costs of the Vessel's arrest, *see* Rybovich Motion at 3.[6] According to Rybovich, the "custodial services for the Vessel, personal watercraft and tenders continue to accrue at the rate of $1,480.47 per day." *Id.*

Rybovich is entitled to these expenses—and no one has suggested otherwise. This Court, after all, *ordered* Rybovich to expend these funds in the interests of *all* the lienholders in this case. *See* Order Granting Motion to Appoint Substitute Custodian [ECF No. 8] at 2. And it's hornbook law that "[a]nything that maintain[s] the value of the ship benefit[s] all of the lienholders of the ship." *Associated Metals & Mins. Corp.*, 41 F.3d at 1018. Without Rybovich as substitute custodian, the U.S. Marshal would have been forced to pay to store the Vessel itself—hoping to collect reimbursement from the parties along the way. *See* 28 U.S.C. § 1921 ("The marshals shall collect, in advance, a deposit to cover the initial expenses for special services [such as keeping attached property, including boats or vessels],

---

[4] The Court approved Rybovich's request to serve as the Vessel's substitute custodian, *see* Order Appointing Substitute Custodian [ECF No. 8], and granted Rybovich's motion to remove and store the Vessel's artwork, *see* Order Regarding Sale of Vessel and Removal of Tenders and Artwork [ECF No. 110].

[5] *See also* Bellisima Status Report Regarding Artwork [ECF No. 118-1] at 1–3.

[6] This Court granted Rybovich's Motion for Warrant of Arrest In Rem [ECF No. 9], which the U.S. Marshal executed on February 25, 2020 [ECF No. 11].

and periodically thereafter such amounts as may be necessary to pay such expenses until the litigation is concluded."). Rybovich, in short, is entitled to administrative priority for its *custodia legis* expenses, and (without objection) its Motion for Summary Judgment on its claim for those expenses is **GRANTED**.

## II. Advances made on the Vessel's Behalf

Both Rybovich and the Crew move for summary judgment on their separate claims for damages arising from the Defendants' failure to pay for the Yacht's "necessaries." Rybovich Motion at 2; Crew Motion at 6. "A person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel." 46 U.S.C. § 31342 (cleaned up). "'Necessaries' includes repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). Since Congress passed the Federal Maritime Lien Act, 46 U.S.C. § 971 *et seq.*—in which it allowed admiralty creditors to file maritime liens for "necessaries"—courts have taken an increasingly broad view of "necessaries," to the point where the term now "include[s] almost any goods or services which are convenient or useful to the vessel[,]" *Payne v. S.S. Tropic Breeze*, 423 F.2d 236, 240–41 (1st Cir. 1970) (detailing the history of the "necessaries" lien). The Eleventh Circuit, in fact, has said that the term "was not intended to be exhaustive" and "has been liberally construed to include what is reasonably needed in the ship's business." *Bradford Marine, Inc. v. M/V Sea Falcon*, 64 F.3d 585, 589 (11th Cir. 1995) (cleaned up) (collecting cases). In evaluating a claim for "necessaries," we ask "whether the goods or services in question were necessary to the continued operation of the vessel." *S.S. Tropic Breeze*, 423 F.2d at 241.

Because debts stemming from the provision of "necessaries" come with preferred status, the statute invests *only* the ship's owner, its captain, and the person (or entity) entrusted with the ship's management with the authority to authorize those debts. 46 U.S.C. § 31341. Since Thornburn both captains and manages the Yacht, *see* Crew SOF ¶ 2; Rybovich SOF ¶¶ 8–11; *see also* Thornburn

Employment Agreement [ECF No. 111-1] at 16 (defining David Thornburn and Rodilin Hionguin as "the Managers"), he had that authority. And, as we'll see in a moment, it's undisputed that, on at least eight occasions, Thornburn authorized Rybovich to spend money on necessaries for the Vessel.

## A. Rybovich's Claim for Necessaries

Rybovich claims $510,979.60 for *necessaries* it provided through February 24, 2020—the day before the Vessel's arrest. *See* Rybovich Motion at 2; *see also* Warrant for Arrest In Rem Returned Executed [ECF No. 11]. Rybovich tell us that "[t]his amount encompasses $476,992.80 of storage, services, and supplies provided to the Vessel" from May 27, 2019[7] through February 24, 2020, *plus* "$33,986.48 of prejudgment interest" (as stipulated in the Dockage Agreement Captain Thornburn signed). Rybovich Motion at 2; *see also* Dockage Agreement at 2–3 (listing the Blue Star's "arriving date" as May 27, 2019). These two amounts added together equal $510,979.28. Rybovich does not explain the 32-cent surcharge it appears to have tacked on. But the services and supplies—costing, in total, $476,992.80—comprise the work Rybovich performed on eight separate occasions from May to September 2019—all with authorization from Captain Thornburn. *See* Rybovich SOF ¶¶ 12–23 (citing 5/1/2019 Service Proposal & Work Authorization [ECF No. 1-3] at 9 (authorizing $167,728.69 for repairs and services to the Vessel); 5/31/2019 Work Authorization [ECF No. 1-4] (authorizing evaluation of running gear); 6/10/2019 Work Authorization [ECF No. 1-5] at 3 (authorizing work at proposed rate of $16,578); 6/27/2019 Work Authorization [ECF No. 1-6] at 2 (approving work estimated at $5,899.50); 6/25/2019 Work Authorization [ECF No. 1-7] at 2 (approving estimate for $7,257.50 of work); 8/9/2019 Work Authorization [ECF No. 1-8] at 1 (approving estimate of $9,386.00); 9/12/2019 Work Authorization [ECF No. 1-9] at 2 (authorizing work at rate of $95/hour);

---

[7] Rybovich doesn't says precisely *when* it began providing the Yacht with "necessaries." But, since no party has suggested otherwise, we'll assume that the "necessaries" began on May 27, 2019, when the Yacht was first scheduled to arrive. *See* Dockage Agreement at 2.

9/23/2019 Work Authorization [ECF No. 1-10] at 2 (approving work on the Vessel at $85/hour). Rybovich has appended several invoices that detail the precise costs of these services. *See* Rybovich SOF ¶ 21; *see generally* Invoices [ECF No. 1-11]. No one has objected to Rybovich's claim. *See generally* Docket. And, since the claim is amply supported by the record, Rybovich's Motion for Summary Judgment on its necessaries claim (in the amount of $510,979.28) is **GRANTED**.

### B. Captain Thornburn's Claim for Necessaries

Captain Thornburn also wants summary judgment on his claim for necessaries. *See* Crew Motion at 6. Here, however, the Defendants *have* filed a Response, in which they contend (quite generally) that Thornburn has failed to establish the necessity of the expenses he wants repaid. *See* Response at 2. As the Defendants rightly point out, the "'rule of advances' provides that [a] creditor may acquire a maritime lien only if it: 1) advances money on the credit of the vessel; 2) which is used to discharge a maritime lien." *Id.* at 4 (citing *Wilkins v. Commercial Inv. Tr. Corp.*, 153 F.3d 1273, 1276–77 (11th Cir. 1998)). In *Wilkins*, the Eleventh Circuit pointed out that "[n]ot just any creditor whose money goes to discharge maritime liens himself acquires a maritime lien"; "[r]ather, the advance must be on the credit of the vessel." 153 F.3d at 1276. So, "common-law presume[s] that anyone making advances to provide necessaries to a vessel does so on the vessel's credit, and not merely on the credit of any individual." *Id.*

Thornburn captained the Yacht. As master of the Vessel, he had the authority to procure necessaries (like supplies and repairs). *See, e.g.*, *Epstein v. Corporacion Peruana de Vapores*, 325 F. Supp. 535, 537 (S.D.N.Y. 1971) (observing that, under the law of admiralty, "the master of a vessel possesses full authority to make purchases binding upon the vessel's owner for 'necessaries' to be used on board his own ship unless the contrary is clearly stated to all concerned"). That authorization entitles him to a maritime lien for the full amount of those necessaries. *See* 46 U.S.C. § 31342 ("A person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime

lien on the vessel." (cleaned up)). But *how much* is Thornburn owed? Well, he seeks a maritime lien for the following amounts:

| Date | Description | Amount |
|------|-------------|--------|
| 06/14/2018 | Payment to New Media | $45,040.00 |
| 06/21/2018 | Payment to Yacht Chandlers | $47,840.00 |
| 11/15/2018 | Payment to Harmony Yacht Services | $27,973.76 |
| 07/23/2019 | Payment to Mega Yacht Refinishing | $26,780.00 |
| 09/17/2019 | Payment to Mega Yacht Refinishing | $45,000.00 |
| 10/2019 | Payment to HSBC for Petty Cash | $2,000.00 |
| 10/2019 | Payment to Chef Dave Talling for wages | $2,000.00 |
| **TOTAL** | | **$196,663.76** |

Crew SOF ¶ 5.[8]

Thornburn is plainly entitled to summary judgment on *one* of these—and the Defendants don't *really*[9] suggest otherwise. *See* Response at 4–5. Specifically, Thornburn has documented his payment of $26,780.00 for repairs to the Yacht in July of 2019. As proof of this repair, Thornburn has submitted an invoice from Blue Star. *See* 7/8/2019 Blue Star Refit Invoice [ECF No. 111-2] at 62–63 (reflecting bill to, and payment by, "D. Thornburn" of $26,780.00 for Blue Star refitting).

The Defendants never challenge this request—either with evidence of their own or (even) with a specific disputation of fact. Instead, they simply lump all the requests together and criticize the Crew for "attach[ing] a series of invoices and other documents to the declaration in an effort to

___

[8] Unfortunately, because the Crew did not use pincites (a violation of S.D. FLA. L.R. 56.1(b)(1)), the Court had to work through the document manually—and with a (liberal) use of the "find" function (control-F). We remind the Crew (and the Defendants) that "[c]ourts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material." *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002).

[9] More on this below.

support these claims, but aside from a few obvious charges, there is no way to determine whether the items listed in the invoices are in fact necessaries." Response at 4–5. Since the Defendants never bother to tell us which of Thornburn's requests they find "obvious," we're left to guess about their intentions: Are they objecting to all of them? Some of them? And, if only some, which ones? The Defendants' (almost-meaninglessly) generic disputation is, in short, plainly insufficient as a matter of law. *See* FED. R. CIV. P. 56(c)(1) (requiring a party who asserts that a fact is genuinely disputed to "support the assertion by" citing specific evidence); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) ("There is a genuine issue of material fact *if the nonmoving party has produced evidence* such that a reasonable factfinder could return a verdict in its favor." (emphasis added)).

Still, "material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, *provided that* . . . the Court finds that the material fact at issue is *supported by properly cited record evidence*[.]" S.D. FLA. L.R. 56.1(c) (emphasis added). Fortunately, unlike some of his other requests—discussed below—Thornburn has "supported" this one advance with "properly cited record evidence." He, in fact, offers a bill from Mega Yacht Refinishing—a third-party repair company—reflecting the total amount he paid ($26,780.00), what the payment was for ("Blue Star Refit"), the names of the 14 Mega Yacht workers who carried out the repairs,[10] the number of hours each person worked, and each worker's hourly rate. *See* 7/8/2019 Blue Star Refit Invoice [ECF No. 111-2] at 62–63.

To this, the Defendants say nothing: They offer no evidence to rebut Thornburn's assertions; they never suggest that Thornburn didn't actually make this payment; and they don't argue that the payment was for anything other than necessaries. They've thus waived any such argument. *See Jones v.*

---

[10] They are: Wallison Moura, Vitor Cesar, Helio Neves, Saulo Magalhaes, Danilo Pierobom, Andy Ramirez, Luis Escobar, Edgar Cartagena, Ivis Tinoco, Marlon Alas, Jhony Matute, Marcos Gomes, Rubben Alas, and Luis Alonso. 7/8/2019 Blue Star Refit Invoice [ECF No. 111-2] at 62–63.

*Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed."). And so, we **GRANT** Thornburn's Motion for Summary Judgment as to this payment.

The viability of Thornburn's other requests, however, isn't as clear. Take, for example, Thornburn's $45,040.00 payment to New Media Holding Company—the only advance the Defendants specifically contest. *See* Response at 5. As the Defendants rightly note, it's impossible, from the redacted credit card excerpt Thornburn submitted, to say what this payment was for. That statement, after all, shows only that, on June 14, 2018, "-45,040.00" was "paid out" to "New Media Holding Company LLC." 6/14/2018 Redacted Credit Card Statement [ECF No. 111-2] at 6. We've searched in vain through the Crew's Motion, its Declaration, and its Intervening Complaint for any indication about what New Media is, what it does, or why Thornburn paid it $45,040.00. *See generally* Crew Motion; Crew Decl. [ECF No. 111-1] at 3–5; Crew Complaint.

Nor does Thornburn's own declaration help him. In that declaration, Thornburn says only that the payment was an "advance[ ] on behalf of the Vessel M/Y BLUE STAR" and adds that it was "for necessaries and wages for the M/Y BLUE STAR." Thornburn Decl. [ECF No. 111-2] at 3. But "necessaries" is a term of art in admiralty law. *See, e.g.*, 46 U.S.C. § 31301(4) ("'Necessaries' includes repairs, supplies, towage, and the use of a dry dock or marine railway."); *The Lord Baltimore*, 269 F. 824, 827 (E.D. Pa. 1921) (observing that, while "[n]o hard and fast definition of 'necessaries' can be given[,]" the "test is whether in kind and quantity what is furnished is within the reasonable needs of the ship's business") *rev'd on other grounds*, 273 F. 990 (3rd Cir. 1921). What constitutes a "necessary" is therefore a question of law. Thornburn's assertion that the payment was for "necessaries" is thus a legal conclusion—not a statement of fact—to which we owe no deference. *See Smith v. Villapando*, 2010 WL 11652393, at *3 (S.D. Fla. Feb. 8, 2010) (Moore, J.) ("Courts are not to infer causation or construe legal conclusions as facts." (citing *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242,

1248–49 (11th Cir. 2005))). And this makes sense. To grant a plaintiff summary judgment for stating, in the most conclusory way, that a payment was "for necessaries" would be to absolve plaintiffs of their obligation to support their assertions with "properly cited record evidence." All a maritime plaintiff would have to do to prevail on his claim for necessaries would be to list, in a bland declaration, certain expenses and then to declare that the expenses were for "necessaries." And there would be very little the yacht owner could to do rebut that assertion since he (almost by definition) will not have been present when the expense was incurred and may know very little about what it was for. This cannot be the law.

Thornburn's claim for $29,973.76—paid to Harmony Yachting Services—fails for similar reasons. The only document that (even remotely) supports this charge—remember, Thornburn gives us no pincites—is a redacted statement (of what, we're not at all sure) reflecting a "SWIFT Payment" of "27,973.16" from November 15, 2018 that's somehow associated with (the statement doesn't say whether it's a payment *to* someone or a receipt *from* someone) "Harmony Yachting Ser A/C 2002862 REF: My Blue Star." Undated Redacted Statement [ECF No. 111-2] at 61. There are, in short, two major problems with this request. *First*, the statement we've uncovered shows a payment that's some $2,000 less than the sum Thornburn is asking for. Is this a typo? Is there some interest he's seeking? Some fee? A penalty? Who can say? *Second*, as with the other charges, Thornburn says only that this payment was an "advance[ ] on behalf of the Vessel M/Y BLUE STAR" and that it was "for necessaries and wages for the M/Y BLUE STAR." Thornburn Decl. [ECF No. 111-2] at 3. Again, however, to prevail at summary judgment, Thornburn must do more than regurgitate the elements of his claim; he must support his assertions *with facts*. Since he hasn't done that, his claim fails (at least for now).

Thornburn's request for $47,840.00 he (allegedly) paid to Yacht Chandlers fares little better. Here, again, Thornburn hasn't explained what this payment was for. *See generally* Thornburn Decl.

14

[ECF No. 111-2] (attesting, in the most conclusory way, that this payment was for "advances on behalf of the Vessel M/Y BLUE STAR"). And (again) he hasn't adduced a single piece of evidence reflecting a payment of $47,840.00. Remember, Thornburn hasn't pincited *a single page* of his 69-page Exhibit 1—which, in most cases, would be reason enough to deny his motion, *see, e.g.*, *Duran v. Sirgedas*, 240 F. App'x 104, 116 (7th Cir. 2007) ("A district court may deny a motion for summary judgment because the movant did not provide record support for his motion."). Nevertheless, in the interest of completeness, we've spent hours going through the excerpts in Exhibit 1 ourselves. In doing so, we've found (with no help from Thornburn) an invoice for $47,800.45, *see* Undated Yacht Chandlers Invoice [ECF No. 111-2] at 7–8 (not reflecting any payment), and a partial credit card statement showing a payment of $47,800.45 from Thornburn to Yacht Chandlers, *see* 6/18/2018 Santander Payment Details [ECF No. 111-2] at 60. Thornburn has also included a series of invoices for lesser amounts. *See* Yacht Chandlers Invoices [ECF No. 111-2] at 9–59 (not reflecting payment). But we could find nothing in the record showing the payment Thornburn is looking for here: $47,840.00. Thornburn will need to shore up these discrepancies at trial. For now, though, he hasn't adduced nearly enough to prevail at summary judgment.

Nor were these the only "necessaries" requests for which we could find no record support. Scouring through Exhibit 1 (again, with no help from Thornburn), we located a credit card statement reflecting a payment of $45,040 to Mega Yacht Refinishing. *See* 9/17/2019 Redacted Credit Card Statement [ECF No. 111-2] at 69. But Thornburn doesn't request $45,040 for that payment; he asks for $45,000 flat, *see* Crew SOF ¶ 5; Thornburn Decl. [ECF No. 111-2] at 3—and he never explains the discrepancy, *see* Thornburn Decl.; *see also* Crew Motion. In any event (again), Thornburn doesn't tell us what this payment was for. As with the other requests, he simply swears that this "Payment to Mega Yacht Refinishing" was an "advance[ ] on behalf of the Vessel M/Y BLUE STAR" that was "made

on the authority of the owner of the Vessel and w[as] for necessaries and wages for the M/Y BLUE STAR." Thornburn Decl. [ECF No. 111-2] at 3. We'll let him try to prove those assertions at trial.

As for the $2,000.00 Thornburn says he paid to HSBC for petty cash—whatever that means—the records reflect a wire transfer of $2,000.00 to Thornburn's HSBC account from a Santander account (also bearing his name). *See* 10/18/19 HSBC Statement [ECF No. 111-2] at 72. Again, however, Thornburn doesn't tell us what this transfer was for or how the petty cash was used for necessaries. *See generally* Thornburn Decl. (affirming that this transfer was "made on the authority of the owner of the Vessel and w[as] for necessaries and wages for the M/Y BLUE STAR"). He'll have to tie up this loose end at trial.

Finally, there's the $2,000.00 Thornburn e-transferred from his personal bank account to David Talling, *see* 10/22/2019 Thornburn Account e-Transfer [ECF No. 111-2] at 73; 10/31/2019 Thornburn Scotiabank Account Summary [ECF No. 111-2] at 74, who worked as the Yacht's chef. *See* Crew SOF ¶ 2; Dave Talling Employment Agreement [ECF No. 111-1] at 42–44. Thornburn alleges that this payment was for Talling's wages. *See* Thornburn Decl. [ECF No. 111-2] at 2. Admittedly, "[o]ne who advances money to pay crew's wages is entitled to a [preferred] maritime lien." *Drill Ship Mission Expl.*, 668 F.2d at 813–14. And it's clear that Thornburn paid Talling $2,000. But how do we know that the $2,000 was, in fact, for Talling's *wages*? For that proposition, all we have is Thornburn's self-serving declaration, in which he refers to this transfer as "Payment to Chef Dave Talling for Wages." Thornburn Decl. [ECF No. 111-2] at 3. But it's not our job at summary judgment to weigh credibility, *see McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment."), so we'll have to wait till trial to see how well Thornburn explains what this payment was for.

Thornburn, in short, continued to care for the Yacht and its crew long after his employer had disappeared. And he's entitled to a maritime lien for any necessary expenses he incurred during that time. But he bears the burden of proving (*with* specific evidence) the *amount* of those expenses—and we'll allow him to do that at trial. For now, we'll **GRANT in part** his Motion for Summary Judgment as to the $26,780.00 the Defendants aren't really contesting, and we'll **DENY in part** his Motion as to the rest.

## III.    The Crew's Wages

Seamen's wages—as Justice Joseph Story was fond of saying—"are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages." *The John G. Stevens*, 170 U.S. 113, 119 (1898). "Seamen are wards of admiralty whose rights federal courts are duty-bound to jealously protect." *Isbrandtsen Marine Servs., Inc. v. M/V Inagua Tania*, 93 F.3d 728, 733 (11th Cir. 1996) (cleaned up) (quoting *Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1160–61 (5th Cir. 1985)).

The Defendants concede that the Crew Plaintiffs are entitled to a maritime lien against the Vessel for unpaid wages.[11] *See* Response at 1. But the Defendants dispute *some* of the Crew Plaintiffs' claims—mainly those for vacation pay and management fees. *See id.* at 1–2. Even though the Defendants haven't specifically disputed the wage claims of *all* the Crew Plaintiffs, "the court may grant summary judgment only if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3).

---

[11] The parties haven't fully addressed *which* law governs the crew members' employment agreements. *Compare* Crew Motion at 5 (asserting that "[t]he employment agreements are either silent on the applicable law, or governed by the laws of Gibraltar," and adding that, "[u]nder the laws of the Cayman Islands, Plaintiffs are entitled to a maritime lien for wages"), *with* Response (failing to address which nation's laws govern the employment contracts). Fortunately, we needn't resolve this thorny question today because *both* the Crew and the Defendants agree that "certain amounts are owed the Vessel's crew for wages and that these unpaid wage claims give rise to a maritime lien against the Vessel." Response at 1.

The Crew Plaintiffs are entitled to a maritime lien on the Vessel—that much is clear. But they haven't established *the amount* of that lien. Here's why. While the Crew Plaintiffs have outlined the total amounts (they say) they're owed, *see* Crew SOF ¶ 3—and the months during which they worked, *see id.*—they never explain *how* they calculated those amounts or whether those amounts *actually* correspond to the wages they're owed. So, for example, the Crew Plaintiffs claim that, for their work during the eight months from June to November 2019 and January to February 2020, Captain and Rodilin Thornburn[12] are owed $156,871.86 and $12,120.55, respectively. *Id.* But the Thornburns' employment agreement provides that "David Thornburn and Rodilin Hionguin ('the Managers')" will receive as "the Managers a monthly salary of twenty seven thousand three hundred dollars ($27,300 USD) during the term of this Agreement," Thornburns' Employment Agreement [ECF No. 111-1] at 16—and the Crew Plaintiffs never explain how, from this agreement, they came up with the sums they're now requesting, *see generally* Crew Motion.[13] The agreement, after all, doesn't indicate how the couple's wages should be split between them—and, in any case, eight months at $27,300.00 per month *doesn't* equal $168,992.41, which is what you get when you add $156,871.86 to $12,120.55.[14]

---

[12] Although the Crew Plaintiffs refer to Captain Thornburn's wife as "Rodilin Thornburn," *see, e.g.*, Crew SOF ¶ 3; Crew Decl. [ECF No. 111-1] at 1, 14, her employment agreement lists her as "Rodilin Hionguin," Employment Agreement [ECF No. 111-1] at 16. No matter. To avoid confusion, we'll refer to her by her married name: "Rodilin Thornburn."

[13] Some simple math reveals that the Crew Plaintiffs didn't properly multiply their monthly salaries by the number of months for which they weren't compensated. *See* Crew SOF ¶ 3. Talling, for example, contracted to receive "a monthly salary of seven thousand [f]ive hundred dollars USD," Talling Employment Agreement [ECF No. 111-2] at 42, and he's here claiming wages for three months (September–November 2019), *see* Crew SOF ¶ 3. Three times $7,500.00 is (of course) $22,500—but Talling seeks only $22,400.00. *Id.* Why? No one can say because the Crew Plaintiffs never note (let alone explain) the discrepancy.

[14] Again, for what it's worth, $27,300 x 8 = $218,400. Now, it's certainly possible—perhaps likely— that there's a way to square the Crew Plaintiffs' funky math. The point here, though, is that it was the Crew's burden to square it. Since they haven't, they aren't entitled to summary judgment on their claims.

Confusing things further, the Crew Plaintiffs indicate that another portion of Rodilin Thornburn's wages are *not* reflected in the $12,120.55 she's seeking, even though they *are* included in the "lump sum" of $91,809.31 of wages the Defendants allegedly owe the Filipino crewmembers—referred to as "Crew ASIA." Crew SOF ¶ 3.[15] The Crew Plaintiffs say that the "Filipino crew were paid via lump sum, which is why their [requested] wages are combined." *Id.* But, once again, the Crew Plaintiffs don't explain how they calculated the $91,809.31 they're asking for. *See generally id.*

As another example, the Crew Plaintiffs claim that Michael Brittenden is owed $36,400.00 for his work from September through December 2019. *See* Crew SOF ¶ 3. Brittenden's employment contract stipulates that he should be paid at a rate of $400 per day for "periods consisting [of] 10-14-week blocks[.]" Brittenden Employment Agreement [ECF No. 111-1] at 24. Unfortunately, the Crew Plaintiffs never tell us how many days Brittenden *actually* worked. We could, of course, do the math ourselves: $36,400.00 at $400/hour would mean that Brittenden worked 91 days. But we won't simply assume that to be true, and we won't grant summary judgment on the basis of facts the Crew Plaintiffs themselves never alleged or proved. At summary judgment, after all, the *moving* party bears the burden of "showing the *absence* of a genuine issue as to any material fact." *Allen*, 121 F.3d at 646 (emphasis added).

The Crew Plaintiffs, in sum, *have* shown that the Defendants are liable to them for their wages. But, as to *the amount* of those wages, the Crew Plaintiffs have failed to "inform[ ] the district court of the basis for [their] motion, and identify[ ] those portions of [the record] which [they] believe[ ] demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Accordingly, this portion of the Crew Plaintiffs' motion is **DENIED**.

---

[15] The Crew ASIA members are Maria Tuvilla, Gregor Tuvilla, Karen Magpantay, Frittzie Dumdum, and Richard Lima. Crew SOF ¶ 3.

## IV.    Repatriation Expenses

Boat owners bear a general obligation to repatriate seamen who find themselves adrift without a passage home. *See* 1 THE LAW OF SEAMEN § 18:10 (5th ed.) ("The breaking up of a voyage as a result of an attachment of the vessel and sale by a marshal, thus resulting in loss of employment by the seamen, entitles them to transportation from the port of seizure to the port of shipment."); *cf. Am. Foreign S.S. Co. v. Matise*, 423 U.S. 150, 157 n.14 (1975) ("A shipowner's obligation to repatriate a seaman discharged in a foreign port depends on the circumstances of the discharge. For instance, there is a general obligation to repatriate seamen who through causes other than their own misconduct, have been injured."). When assessing claims for repatriation expenses, courts look to the terms of the seamen's contracts. *See Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1237 (5th Cir. 1989) (reviewing the provisions of the crew's contracts in evaluating the claims of foreign seamen to repatriation costs).

Captain Thornburn alleges that he spent $3,163.50 in repatriating two crewmembers: Marco Volschenk (to South Africa) and Richard Lima (to the Philippines). *See* Crew Motion at 6; Crew SOF ¶ 4; Thornburn Decl. [ECF No. 111-2] at 3. This sum apparently represents the money Captain Thornburn spent on Volschenk's and Lima's trips home. *See* Global Marine Travel Invoice [ECF No. 111-2] at 76–78 (reflecting travel costs for Marco Volschenk); Crew Asia Inc. Statement [ECF No. 111-2] at 79–80 (reflecting travel costs for Richard Lima). Unlike some of their fellow crewmembers, Volschenk's and Lima's employment agreements explicitly provide that they "shall be governed by and construed in accordance with laws of Gibraltar." Volschenk Employment Agreement [ECF No. 111-1] at 22; Lima Employment Agreement [ECF No. 111-1] at 20. And, as the Crew Plaintiffs point out, under the laws of Gibraltar, when "a person employed as a seaman on a registered ship is left behind in any country outside of Gibraltar . . . the persons who last employed him as a seaman shall make such provision for his return[.]" Crew Motion at 6 (quoting Gibraltar Merchant Shipping (Safety, etc.) Act No. 1995-13 § 44.(1)). The Defendants don't object to this aspect of the Crew Plaintiffs'

Motion. *See generally* Response. Nor (it goes without saying) do they "come forward with specific facts showing there is a genuine issue for trial." *Bailey*, 284 F.3d at 1243. Since the Crew Plaintiffs have supported this aspect of their case with specific evidence, the Court will **GRANT** their Motion for Summary Judgment on their claim for repatriation expenses.

***

After a careful review of the briefs, the record, and the governing law, the Court hereby **ORDERS and ADJUDGES** as follows:

1. Rybovich's Motion for Summary Judgment [ECF No. 112] is **GRANTED**;

2. The Intervening Crew Plaintiffs' Motion for Summary Judgment [ECF No. 111] is **GRANTED in part and DENIED in part** as follows:

    a. The motion for necessaries is **GRANTED** with respect to the $26,780.00 Captain Thornburn paid to Mega Yacht Refinishing. The motion is **DENIED** as to all other amounts;

    b. The motion for the Crew Plaintiffs' wages is **GRANTED** on the issue of the Defendants' liability, but **DENIED** as to *the amount* of that liability;

    c. The motion for repatriation expenses is **GRANTED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 29th day of June 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record