UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 20-80136-CIV-ALTMAN

**RYBOVICH BOAT COMPANY, LLC,**

   *Plaintiff*,

**SOUTHERN CROSS BOATWORKS, INC.,**

   *Intervening Plaintiff*,

**DAVID THORNBURN,** *et al.***,**

   *Intervening Plaintiffs*,

**MEGA YACHT REFINISHING, LLC,**

   *Intervening Plaintiff*,

**YACHT CHANDLERS, INC.,**

   *Intervening Plaintiff*,

*v.*

**M/Y** *BLUE STAR*, a 1993 model 37.12 meter Keith Marine motor yacht bearing hull identification number PLK00027F293 and registered with the Cayman Islands Shipping Registry as Official Number 723333, her engines, tackle, furniture, furnishings, apparel, appurtenances, personal watercraft, and tenders *in rem*, **VLADIMIR GUSINSKY a/k/a VLADIMIR GUSINSKI**, and **SHAKRA HOLDINGS LIMITED**, *in personam*,

   *Defendants*.
_____/

## <u>ORDER</u>

In this *in rem* admiralty action, the parties agreed to sell the M/Y *Blue Star* (the "Yacht" or the "Vessel") and to use the proceeds of that sale to pay the Plaintiffs back for certain monies and services the Plaintiffs had advanced on the Yacht's behalf. After three auctions, the Yacht finally sold. But the

Plaintiffs still hold hundreds of thousands of dollars in maritime liens. To recover some portion of those liens, the Plaintiffs have asked us to sell three tenders and 14 paintings that, for years, had been kept on the Yacht.

The *in personam* Defendants, Vladimir Gusinski[1] and Shakra Holdings Limited, concede that the tenders should be sold—but they disagree about the art. In their Motion to Separate the Artwork as a Non-Appurtenance to the Yacht (the "Motion") [ECF No. 187], they contend that the paintings are the personal property of Gusinski, one of the Yacht's quondam owners.[2] After a careful review of the record, we **DENY** the Motion. The artwork—which has been fastened to the walls of the Yacht for as long as anyone can remember—was essential to the Vessel's *mission* as a luxury pleasure yacht. It's, therefore, an appurtenance of the Vessel and is subject to the Plaintiffs' maritime liens.

## BACKGROUND

For years, Gusinski and Shakra owned the Vessel—a 143-foot luxury Yacht. In early 2020, Rybovich Boat Company—the operator of a boat-repair, storage, and marine facility—sued the M/Y *Blue Star*, Gusinski, and Shakra for unpaid fees and other necessaries. *See generally* Complaint [ECF No. 1]. The Yacht's crew intervened in the lawsuit, seeking wages, repatriation expenses, and reimbursement for monies they'd advanced on the Yacht's behalf. *See* Intervening Crew Complaint ("Crew Complaint") [ECF No. 56]. We arrested the Vessel, *see* Warrant for Arrest *In Rem* Returned Executed [ECF No. 11], and appointed Rybovich as substitute custodian for the Yacht, its jet skis, its tenders, and its artwork. *See* Order Permitting Credit Bidding [ECF No. 190] at 4 (recognizing that Rybovich was entitled to *custodia legis* fees through July 1, 2021).

---

[1] Gusinski's name appears on the docket with several different spellings. In this Order, we use the spelling Gusinski himself chose in his Sworn Statement in Support of the Motion to Separate Artwork [ECF No. 187-1]—except, of course, when we quote from a document that employs a different spelling.

[2] The Motion is now ripe for resolution. *See* Plaintiff's Response in Opposition to Motion to Separate the Artwork (the "Response") [ECF No. 188]; Reply to Plaintiff's Response to Motion to Separate Artwork (the "Reply") [ECF No. 195].

On three separate occasions, we ordered the U.S. Marshal to auction off the Yacht and its jet skis. *See* Order Approving First Sale [ECF No. 124]; Order Approving Second Sale [ECF No. 157]; Paperless Minute Entry for July 12, 2021 Hearing [ECF No. 180]. During the first two auctions, no one offered the minimum bid. *See* U.S. Marshal Return on Order of Sale for the First Auction [ECF No. 133]; U.S. Marshal Return on Order of Sale for the Second Auction [ECF No. 172]. In the first, one bidder initially offered a below-minimum bid, *see* Order Approving the Vessel Sale [ECF No. 129] at 2 (describing the terms of the offer), but then, after the inspection, rescinded his offer, *see* Second Motion for Sale of Vessel [ECF No. 135] at 2 ("Ultimately, the purchaser backed out after the survey[.]"). In the second, no one bid at all.

As the months passed, it became clear that the M/Y *Blue Star*'s sale would never cover its swelling debts. Before the third auction, therefore, we granted Rybovich's request to credit bid its *custodia legis* fees against the price of the Vessel. *See generally* Order Permitting Credit Bidding. At that third auction, Rybovich entered the winning (and, as it turned out, the *only*) bid—a $75,000 cash offer. *See* U.S. Marshal Return on Order of Sale for the Third Auction [ECF No. 194]. After conferring with the Court, *see* Paperless Minute Entry for August 12, 2021 Hearing [ECF No. 205], Rybovich withdrew its $75,000 cash bid and offered, instead, a credit bid of $450,000. *See* Order Confirming the Sale of M/Y *Blue Star* (the "Order Confirming Sale") [ECF No. 212] at 2–3. Without objection from any party, we approved the sale, *id.*—though most of the maritime liens remain.

Now that the Yacht has been sold, we must decide what to do with its tenders and artwork. Although the parties agree that the tenders should be auctioned off, *see* Plaintiffs' Motion to Sell *In Rem* Defendant M/Y *Blue Star*'s Tenders Through a U.S. Marshal's Sale [ECF No. 185], they disagree about the artwork, *see* Plaintiff's Notice Regarding the Court's Order [ECF No. 213] at 2 ("Defendant Shakra Holdings Limited, wants Plaintiffs to stipulate that the Vessel's artwork should be returned to the owner. Plaintiffs will not agree to a stipulation about the artwork because they contend the artwork

3

is an appurtenance of the Vessel and subject to a maritime foreclosure sale to satisfy the maritime liens." (citation omitted)).

In his declaration, Gusinski says that he bought and enjoyed the paintings for years before he brought them onto the Yacht and insists that the Yacht functioned as a pleasure cruise long before the paintings appeared on its walls. *See* Gusinski's Sworn Statement ("Gusinski Declaration") [ECF No. 187-1] ¶¶ 6, 7, 13. With this declaration in hand, the Defendants advance two arguments: *one*, that the artwork isn't essential to the Yacht's ability to *navigate*, *see* Motion at 7–8; *two*, that the Court and the parties have already agreed that the artwork isn't an appurtenance of the Vessel, *id.* at 8. For this second argument, the Defendants point to (a) the parties' Joint Status Report on the proposed sale, which excluded "the three tenders . . . or artwork (14 paintings)," and (b) the Court's Order approving the notice of sale, which didn't include the artwork among the items listed for sale. *Id.*

Rybovich responded by raising several procedural arguments—including standing and equitable estoppel. *See* Response at 1–7. Alternatively, it maintains that, whoever owned the paintings, those paintings have always been appurtenances of the Yacht, *id.* at 8. As support, Rybovich relies on the declaration of David Thornburn—the Yacht's longtime captain and manager—who avers that, throughout his many years of service on the Vessel, the paintings—which were specially fastened onto the Yacht's walls—were *never* removed. *See* Declaration of David Thornburn Supporting Rybovich's Summary Judgment Motion [ECF No. 116] ¶¶ 2, 6.

## THE LAW

It's hornbook law that "[a] maritime lien is a privileged claim upon maritime property, such as a vessel, arising out of services rendered to . . . that property." *Canaveral Port Auth. v. M/V Liquid Vegas*, 2009 WL 3347596, at *4 (M.D. Fla. Oct. 15, 2009) (Baker, Mag. J.) (quoting THOMAS J. SCHOENBAUM, 1 ADMIRALTY AND MARITIME LAW § 9-1 (4th ed. 2004)). It's thus a "fundamental principle" of admiralty law that "the vessel itself, along with all equipment that is essential to the ship's

navigation and operation, is subject to maritime liens[,] . . . regardless of who the actual owner of the equipment may be." *Motor-Servs. Hugo Stamp, Inc. v. M/V Regal Empress*, 165 F. App'x 837, 840 (11th Cir. 2006) (citations omitted). "This rule balances the interests of keeping ships active and protecting maritime businesses who provide goods and services on credit by making the entire vessel, including all the equipment essential to the completion of the voyage upon which it is embarked, stand as security for the debt." *Id.* "The scope of a maritime lien includes the vessel and its apparel, fixtures, and appurtenances, even if they are leased or owned by someone other than the vessel owner." *Liquid Vegas*, 2009 WL 3347596, at *4 (citing *Sw. Washington Prod. Credit Ass'n v. O/S New San Joseph*, 1977 AMC 1123 (N.D. Cal. May 13, 1977)).

"An appurtenance is commonly defined as an item that is essential to the ship's navigation, operation, or mission." *Gonzalez v. M/V Destiny Panama*, 102 F. Supp. 2d 1352, 1354 (S.D. Fla. 2000) (Jordan, J.). "To determine whether an item is an appurtenance to a vessel, we must look to the relation it bears to the actual service of the vessel." *Anderson v. United States*, 317 F.3d 1235, 1238 (11th Cir. 2003) (cleaned up). In assessing whether an item is an appurtenance to a vessel, "[n]either installation, location, nor ownership is dipositive of the matter." *Gonzalez*, 102 F. Supp. 2d at 1356. "Rather, an appurtenance is any specifically identifiable item that is destined for use aboard a specifically identifiable vessel and is essential to the vessel's navigation, operation, or mission." *Id.*; *see also Anderson*, 317 F.3d at 1238 (citing and applying *Gonzalez*'s definition of appurtenance). "The determination [of whether an item is an appurtenance] is commonly made on a case-by-case basis[.]" THOMAS J. SCHOENBAUM, 1 ADMIRALTY AND MARITIME LAW § 9-1 (6th ed. 2020). "Throughout the years, courts have ruled that radio equipment, uninstalled replacement engines, and even fishing permits were essential to their vessels' purposes and, therefore[,] were appurtenances subject to maritime liens." *Regal Empress*, 165 F. App'x at 840 (citing *The Augusta*, 15 F.2d 727, 727–28 (E.D. La. 1920) (radio equipment); *Gonzalez*, 102 F. Supp. 2d at 1354–57 (uninstalled engines); *Gowen, Inc. v. F/V Quality One*,

244 F.3d 64, 67–70 (1st Cir. 2001) (fishing permits)); *see also* SCHOENBAUM, *supra*, § 9-1 (6th ed. 2020).

## ANALYSIS

We start by asking whether the artwork constitutes (1) a "specifically identifiable item," (2) "use[d] aboard a specifically identifiable vessel," that (3) "is essential to the vessel's navigation, operation, or mission." *Gonzalez*, 102 F. Supp. 2d at 1356. Because the answer to all three questions is "yes," the paintings are appurtenances of the Yacht subject to the Plaintiffs' maritime liens.

The first two elements are easy and weigh heavily in the Plaintiffs' favor. Starting with the first, the Defendants don't disagree that the Yacht's 14 paintings constitute "specifically identifiable item[s]." *See* Gusinski Declaration ¶¶ 2, 4–5 (identifying the artwork as "[t]he 14 paintings that . . . were purchased by [Gusinski] and are part of [his] collection of classic Russian art" and as paintings "purchased at Christie's London in 1998[,] . . . purchased in 1994 at Sotheby's London[,] . . . [and] collected . . . between 1995 and 1996"). And this makes sense. The paintings, after all, have been separately stored and appraised during the course of this litigation. *See* Anubis Appraisal & Estate Services' Appraisal of the Artwork [ECF No. 98-1] (identifying and appraising each of the 14 paintings). Nor is there any dispute about the artwork being "use[d] aboard a specifically identifiable vessel" (the second element). For as long as Captain Thornburn can remember, the artwork was aboard one specific vessel—the M/Y *Blue Star*. *See, e.g.*, Declaration of David Thornburn [ECF No. 92-1] ¶ 4 ("The artwork onboard the Vessel . . . has been onboard the Vessel, secured to the walls with screws, for at least as long as I have been Captain (approximately 18 years)."); Declaration of David Thornburn Supporting Rybovich's Summary Judgment Motion ¶ 6 ("M/Y *Blue Star*'s furnishings include paintings, which are specifically secured to the walls inside the yacht. These paintings were never removed from the yacht during my tenure captain/manager."); *id.* ¶ 2 ("I have served as captain and manager of M/Y *Blue Star* for over 10 years."); *see also* Motion for Survey of Vessel and Appraisal of Artwork [ECF No. 90] at 3 n.1 (noting that the "paintings . . . have been

affixed to the walls of the Vessel for approximately eighteen years"); *cf.* Gusinski Declaration ¶ 2 (conceding that "[t]he 14 paintings . . . were onboard the M/Y *Blue Star*").

Moving to the third element, the parties seem to agree that the artwork wasn't "essential" to the Vessel's "navigation" or "operation." *See* Response at 8 (arguing *only* that the "[p]aintings . . . are no doubt appurtenances because they serve the yacht's recreational mission" and that "a vessel with all equipment and appurtenances aboard it that is essential to its mission is subject to maritime liens"—without ever suggesting that the paintings were essential to the Vessel's "navigation" or "operation"). But, straining to read the factors in a way that best suits their position, the Defendants stop there. *See* Motion at 8 ("It cannot be disputed that the Artwork at [sic] has relation to the Vessel's ability to navigate."). In their Motion, in other words, the Defendants *never* contend that the artwork *wasn't* essential to the Yacht's *mission. See generally* Motion. They've thus waived any argument they could've made on this point. *Cf. Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("'[T]he failure to make arguments and cite authorities in support of an issue waives it.").[3]

Nor *could* the Defendants suggest that the words "navigation" and "operation" somehow swallow and encompass the separate noun "mission," such that an item that isn't necessary to the former two can *never* be an appurtenance—even if it *is* necessary to the boat's mission. To the contrary, as we've said, an appurtenance is any item that "is essential to the ship's navigation, operation, *or* mission." *Anderson*, 317 F.3d at 1238 (citing *Gonzalez*, 102 F. Supp. 2d at 1356 (emphasis added)). The test's disjunctive "or" indicates that an item qualifies as an appurtenance if it's essential to either the

---

[3] In their Reply, the Defendants (for the first time) contend that "yachts . . . still fully serve their recreational purpose without artwork onboard." Reply at 4. But, by failing to attack the Plaintiffs' position that the artwork was essential to the Yacht's *mission* in their initial Motion, the Defendants have waived this argument. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). As we explain below, however (*see infra* note 7), this argument would fail on the merits anyway—waiver or no waiver.

boat's navigation *or* its operation *or* its mission. *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012) ("*And* joins a conjunctive list, *or* a disjunctive list[.] . . . With a conjunctive list, all [listed] things are required—while with the disjunctive list, at least one of the [listed things] is required, but any one (or more) of the [listed things] satisfies the requirement."). In misreading the relevant test as they do, the Defendants ignore the basic principle that "[a] ship may have a particular employment assigned to her which may give a specialty to the apparatus that is necessary for that employment." *The Edwin Post*, 11 F. 602, 604 (D. Del. Apr. 1, 1882). This doctrine emphasizes that "[t]he word 'appurtenance' must not be construed with a mere reference to the abstract, naked idea of a ship[.]" *Id.* For this reason, it "would be a preposterous abuse" to consider whether something is an appurtenance without "look[ing] to the relation [the item] bear[s] to the actual service of the vessel." *Id.* at 605.

And this makes sense because, contra the Defendants' position, our federal courts have for centuries recognized as appurtenances items that were essential to a ship's *mission*—even though the items had little to do with the ship's navigation or operation.[4] In our District, in fact, the general rule

---

[4] *See, e.g.*, *Regal Empress*, 165 F. App'x at 840 ("Because [a telecommunications and internet-services] system is vital to the mission of the [ship], the Magistrate Judge correctly concluded that [the] equipment was appurtenant to the ship."); *Gowen, Inc.*, 244 F.3d at 67–70 (holding that fishing permits were an appurtenance because "the creditworthiness of the fishing vessel may well depend on its permits"); *Gonzalez*, 102 F. Supp. 2d at 1354–57 (holding that uninstalled engines were appurtenances because they were essential to the boat's operation); *In re S.S. Tropic Breeze*, 456 F.2d 137, 141(1st Cir. 1972) (holding that cement equipment was an appurtenance to a ship's *mission* as a bulk-cement carrier, even though the equipment wasn't essential to the ship's *navigation*); *Turner v. United States*, 27 F.2d 134, 136 (2d Cir. 1928) (holding that refrigeration equipment, although not essential to *navigation*, was an appurtenance to a vessel carrying meat cargo between South American and British ports because items that are "indispensable to the accomplishment of the enterprise in which she was about to engage" are appurtenances); *The Hope*, 191 F. 243, 246 (D. Mass. 1911) (holding that a net and net lifter were appurtenances to a fishing vessel because they were essential to the ship's *mission*); *The Witch Queen*, 30 F. Cas. 396, 397 (D. Cal. 1874) (holding that a diving bell and an air pump used for pearl fishing were appurtenances because, although unnecessary for *navigation*, they were "indispensable for the accomplishment of the object of the particular [pearl-fishing] voyage"); *Gale v. Laurie*, 5 B. & C. 156, 164 (1826) ("[W]e think[] that whatever is on board a ship for the object of the voyage and adventure on which she is engaged, . . . constitutes a part of the ship and her appurtenances[.] . . . [W]hereas if it

8

seems to be that artwork *can* qualify as an appurtenance to a luxury yacht *if* (as we've explained) it's essential to the yacht's recreational *mission*. *See Goldman Sachs Bank USA v. M/Y Natita*, No. 9:17-CV-80838, 2017 WL 11221117, at *1 (S.D. Fla. Dec. 8, 2017) (Rosenberg, J.) ("The Vessel **SHALL BE** delivered with all . . . other appurtenances thereto, whether on board or ashore, including without limitation, *all artwork*[.]" (emphasis added)).

This crux of this Order, then, boils down to one question: was the artwork "essential" to the Yacht's "mission?" We think that it was.

According to Gusinski, "[t]he Vessel functioned as a pleasure yacht." Gusinski Declaration ¶ 13. And, indeed, the Vessel was registered as a "pleasure yacht." Certificate of British Registry [ECF No. 1-1] (describing the "type of ship" as "pleasure yacht"). It's not a stretch to say, in other words, that the Yacht's mission was to bring pleasure to its occupants. It's true, of course, that pleasure can come in many different shapes and sizes. In our case, though, the feeling of pleasure the Yacht imparted derived, at least in part, from the sense of sophisticated refinement it afforded. The artwork, remember, didn't stand alone. It complimented the fully furnished, multi-cabin superyacht's wood-paneled interiors, its five marble bathrooms (each with capacious soaking tubs), its stainless-steel appliances, its lavish dining room (staffed with a dedicated chef and multiple stewardesses), and its opulent main deck. *See* Marine Consultants Inc.'s Survey of the M/Y *Blue Star* [ECF No. 95-1] at 2, 5–14 (describing the Vessel and providing pictures); *see also* Crew Complaint at 2–3 (listing the crew

---

should be held that nothing is to be considered as a part of the ship that is not necessary for her navigation or motion on the water, a door would be opened to many nice questions, and much discussion and cavil."); *The Dundee*, 1 Hagg. 109, 127 (1813) (rejecting a test that pins the appurtenance inquiry only to whether an item was essential to *navigation* and espousing, as here, a broader test that encompasses the ship's *mission*); *cf.* Ernest F. Hom, *Admiralty: What Constitutes a Ship or Vessel for Purposes of Satisfaction of the Claims of Maritime Tort and Contractor Creditors*, 27 CAL. L. REV. 572, 572–73 (1939) ("However questionable the authority of English admiralty decisions may generally be in this country, *The Dundee* and *Gale v. Laurie* have been cited or relied on in most of the American decisions on the subject.").

members, including a chef and multiple stewardesses); *cf.* Megayacht vs. Superyacht, available at https://www.worthavenueyachts.com/05-08-2019/megayacht-vs-superyacht/ (last visited Nov. 18, 2021) ("Although there is no true definition, a superyacht is considered to be a yacht that is at least 78-feet or 24-meters. A superyacht is synonymous with luxury and glamor[.]"). Viewed in this context—and against this backdrop—it's almost silly to suggest that the paintings weren't essential to the luxurious look-and-feel of the place. Luxury is, of course, *why* those 14 paintings were initially affixed to the Yacht—and it's certainly why those paintings hadn't come off the Yacht's walls for the (almost) 18 years in which Captain Thornburn worked there.[5] *See* Declaration of David Thornburn ¶ 4 ("The artwork onboard the Vessel . . . has been onboard the Vessel, secured to the walls with screws, for at least as long as I have been Captain (approximately 18 years)."); Declaration of David Thornburn Supporting Rybovich's Summary Judgment Motion ¶¶ 2, 6 ("I have served as captain and manager of M/Y *Blue Star* for over 10 years. . . . M/Y *Blue Star*'s furnishings include paintings which are specially

---

[5] The Defendants half-heartedly—and, we should say, rather disingenuously—suggest that Captain Thornburn only worked on the Vessel for four or five years. *See* Motion at 3. For this proposition, they cite the employment agreement Thornburn attached to his Declaration Supporting Rybovich's Summary Judgment Motion [ECF No. 116-1]. As the Defendants point out, that Declaration "is dated June 1, 2015, which[,] of course, shows only that he was employed by Shakra for less than 5 years prior to the Vessels [sic] arrest in January of 2020 rather than 10 years." Motion at 3. This is silly. Captain Thornburn's unrebutted declarations make clear that he worked on the Vessel for almost 18 years. *See* Declaration of David Thornburn; Declaration of David Thornburn Supporting Rybovich's Summary Judgment Motion. He obviously attached only the most recent of his employment contracts because only *that* agreement was relevant to his lien request. *See* Crew Complaint at 4, 5 (claiming that Thornburn is owed a total of $209,796.86 in back wages for the pay periods between June 2019 and March 2020 and a total of $222,859.18 for necessaries he advanced between June 2018 and May 2020); *see also* Declaration of David Thornburn Supporting Rybovich's Summary Judgment Motion at 1 (describing the attached contract as "the *current* Management Agreement between Shakra and myself" (emphasis added)). After all, in deciding how much money Captain Thornburn was owed for the uncompensated services he performed in 2018, 2019, and 2020, only the agreement that governed his employment during *those* years mattered. But there's no evidence—and the Defendants don't cite to any—that this was the first and only employment agreement Captain Thornburn ever signed with the Vessel. *See generally* Motion; Reply. To the contrary, Captain Thornburn specifically referred to this latest agreement as "the current" employment contract—something he wouldn't have been likely to do if it had been his *first* and *only* employment contract with the Vessel.

secured to the walls inside the yacht. These paintings were never removed from the yacht during my tenure as captain/manager.").

Nor does it matter that the paintings weren't the *only* luxury items on the Yacht. On this point, *Liquid Vegas* is instructive. In *Liquid Vegas*, several slot-machine owners intervened in an *in rem* admiralty action against a ship. 2009 WL 2247596, at *3. The intervenors wanted the court to release their slot machines and other gambling equipment. *See id.* In support of their claim that this gaming equipment wasn't an appurtenance of the ship, the intervenors argued that their items "were not part of the vessel, not property of the owner of the vessel, and only 'incidentally' in custody." *Id.* In their view, "the slot machines are not necessary for the mission of the Vessel as a casino vessel in that [the company that runs the vessel] continues to own slot machines which are currently in storage . . . and the old slot machines can be placed aboard the vessel in place of the newer slot machines; plus the newer slot machines can be removed without damages to the vessel by unbolting the equipment[.]" *Id.* at *6. Rejecting these contentions, the court held that "[r]eady access to replacements does not make the installed slot machines any less essential to the 'mission' of the vessel." *Id.* at *8. And, the court said, an item can be an appurtenance *even though* it isn't the only such item that can adequately serve the vessel's mission. *Id.* In arriving at *this* conclusion, *Liquid Vegas* relied heavily on the district court's decision in *Motor-Services Hugo Stamp, Inc. v. M/V Regal Express*, Case No. 8:03-cv-703-24MSS (M.D. Fla. 2003) (Scriven, J.) (Slip Op.).

In that case, six intervenors sought to separate their own items from the *res* of a seized "luxury entertainment cruise ship" that was about to be sold. *See id.* at *8. As relevant here, two of the intervenors wanted the return of their gambling and casino equipment. *Id.* at *15. After noting that "the outcome-determinative issue is whether [the] recreational gambling facilities . . . were necessary to the navigation, operation and mission of the vessel," the court concluded that:

> [T]he M/V Regal Express' mission was to serve as a recreational, luxury cruise liner, providing recreational service to her passengers. While the M/V Regal Empress is not

11

>  first and foremost a gambling cruise ship, gambling is a choice of entertainment provided. Looking then to the 'relations these services bear to the actual services of the vessel,' the Court finds they are appurtenant to the vessel and subject to maritime liens.

*Id.* at *16 (citing *The Frolic*, 148 F. 921, 922 (D.R.I. 1906)). In other words, despite acknowledging that other aspects of the ship contributed to its mission—promoting recreation and luxury[6]—the court still found that the gambling equipment was essential to that mission.

Our case is very similar. In *Regal Empress*, after all, the gambling equipment was an appurtenance *even though* the vessel wasn't "first and foremost" a gambling cruise. Here, by contrast, the paintings are essential to the Yacht's core mission—which is luxury recreation—even though (as in *Regal Empress*) they aren't the *only* means by which that luxury is displayed. And, despite their reliance on *Liquid Vegas*, that decision is equally unhelpful to the Defendants,[7] not just because it reaffirms the

---

[6] These included some of the things the *other* intervenors wanted to separate from the *res*—*e.g.*, photography equipment and lab materials, telecommunications equipment, security equipment, and some food and beverages. *Regal Empress*, slip op. at *6–7 (summarizing the intervenors' arguments). Like the gaming equipment, these items were *likewise* appurtenances because they enhanced the recreational ambiance the ship sought to foster. *Id.* at *11, 13, 17–18. On appeal, the Eleventh Circuit agreed that the telecommunications equipment was an appurtenance. In the appellate panel's view, "[t]here can be no doubt that" equipment "necessary for the provision of telecommunication and internet services aboard a luxury cruise ship is essential to the vessel's mission." *Regal Empress*, 165 F. App'x at 840. The appeal didn't address the other items—including the gambling equipment. *See generally id.*

[7] As we've suggested (*see supra* note 3), the Defendants cite *Liquid Vegas* only in their Reply—and that's just too little too late. *See In re Egidi*, 571 F.3d at 1163. Even there, however, they miss the point. Trying to distinguish *Liquid Vegas*, the Defendants suggest that, while "[a] casino boat cannot operate as a casino boat without gaming equipment[,]" a yacht "can and frequently does operate as a yacht without fine art onboard." Reply at 4. But *Liquid Vegas* didn't hold that the gaming equipment was an appurtenance *merely* because the ship was a casino boat. Indeed, *Liquid Vegas* relied (almost) entirely on *Regal Empress*, where the boat was a recreational vessel that offered several *different* kinds of entertainment, only one of which was gambling. *See Regal Empress*, slip op. at *16. And, while it's true that a yacht may retain some sense of its luxury without these *particular* pieces of art onboard, it's equally true that the *Regal Empress* vessel would've remained an entertainment ship *even* without the specific items at issue in that case. At that level of generality, in other words, *nothing* would be an appurtenance. That's, of course, not what *Liquid Vegas* (or *Regal Empress*) stands for. To the contrary, *Liquid Vegas* unambiguously found that gaming machines *were* essential to the recreational purpose of the vessel, *even though* other gaming machines (and, indeed, other forms of entertainment) were available onboard. *See Liquid Vegas*, 2009 WL 3347569, at *8 ("Virtually any item used on or part of a vessel could be replaced if removed. This does not change its underlying characterization as an

central holding of *Regal Empress*, but also because it emphasizes that an item can be an appurtenance, even if it's easy to replace.

The only case the Defendants cite for their view that an item *cannot* become an appurtenance if it isn't essential to the vessel's *navigation* doesn't say anything close to that. In *First National Bank & Trust Co. of Escanaba v. Oil Screw L. Moor Barge Wiltranco*, 379 F. Supp. 1382 (W.D. Mich. 1973), the trial court "considered all factors" and concluded that a compressor hadn't achieved appurtenance status because it was only used *once*—in "an emergency [as a] stop gap measure." *Id.* at 1392. In arriving at this conclusion, the court said *nothing* at all about whether the compressor was essential to the vessel's navigation.[8] Instead, the court focused on the undisputed facts that (1) the compressor was only "briefly" leased to the vessel, and (2) "[i]t was the intent of the parties that the compressor be removed as soon as the [vessel] could be brought to port for repairs." *Id.* That's obviously not the case here, where the paintings have been on the Vessel for as long as anyone can remember and where there's absolutely no evidence that anyone ever intended to remove them—before the arrest, that is.

Against all this, Gusinski says that "[t]itle the [sic] artwork never transferred to Shakra," Gusinski Declaration ¶ 8, and that "[t]he paintings were not permanently 'affixed' to the Vessel as may have been suggested," *id.* ¶ 9. Rather, he insists, "[t]he artwork was mounted in the typical way artwork is mounted on a yacht, which is required to keep it from falling off the wall in rough seas." *Id.* Neither fact helps him here. Starting with the latter, Gusinksi accepts that the paintings were screwed into the wall. His point seems to be that the manner of installation shouldn't matter much—and he's right:

---

appurtenance."). And that's really all we're saying here—that, while a luxury yacht *could* (at some theoretical level of abstraction) function as a luxury yacht without Russian art, the Russian art *in our case* was nevertheless essential to the mission of *our Yacht*.

[8] As it turns out, it *was* essential to that purpose—for a little while. *See First Nat'l Bank*, 379 F. Supp. at 1392 ("While it can be said that the compressor briefly was necessary for the vessel's navigation and operation in the sense that the vessel could not return to port through the St. Lawrence Seaway without powered winches in accordance with Seaway regulations, it did not become an integral part of the vessel or a segment of the vessel's general equipment.").

13

"Neither installation, location, nor ownership is dipositive of the matter [of appurtenance]." *Gonzalez*, 102 F. Supp. 2d at 1356. Indeed, it's an "ancient principle[] of maritime law" that "components of a vessel, *even though readily removeable*, which are essential . . . for the specific voyage upon which she is embarked become a part of the vessel itself and thus constitute appurtenances or apparel of the vessel." *Stewart & Stevenson Servs., Inc. v. M/V Chris Way MacMillan*, 890 F. Supp. 552, 561 (N.D. Miss. 1995) (emphasis added). As these cases make plain, what matters is, not the manner of installation, but the question we've already answered: *i.e.*, whether the artwork is essential to the vessel's mission. Having resolved that question for the Plaintiffs, we can safely ignore the fact that the artwork was "easily removable."

Gusinki's other point—that Shakra never took title to the artwork—matters even less. Here, Gusinksi seems to think that, by not transferring title over the artwork to the company that owned the boat, he was ensuring that the paintings remained his *personal* property. *See generally* Gusinski Declaration (noting that the paintings "were purchased by [Gusinski] and are part of [his] collection of classic Russian art"). This new title-transfer rule he's invented has the benefit of being extremely simple. It, in fact, would require us to ask only one question: Did the individual transfer ownership of the item over to the company that owns the boat? If the answer is yes, then the item is an appurtenance. If the answer is no, then it isn't. While the simplicity of this new test may be appealing, it suffers from the obvious drawback of being rather silly. Why? Because as soon as we replaced the *Gonzalez* (read: real) test with Gusinski's, no rational individual would ever transfer to the vessel's owner title to *anything*—thus ensuring that *no item* would *ever* qualify as an appurtenance. *Cf. Regal Empress*, slip op. at *15 ("The essential argument advanced by these claimants is that their devices should be excepted from the interlocutory sale because the claimants, on acquiescence of the ship's owners, contractually agreed that the property would be so exempt. If that were the test, then surely all providers of equipment and supplies for the benefit of a vessel's voyage could avoid forfeiture of

their interest by merely tagging their property until their claims of lien had fully been satisfied.").

This cannot be the law—and, fortunately, it isn't. To the contrary, it's by now well-settled that an item can be an appurtenance "regardless of who the actual owner of the equipment may be." *Regal Empress*, 165 F. App'x at 840. Indeed, where (as here) creditors loaned a ship their goods and services with the expectation that the vessel *and* its appurtenances would serve as security, it'd be illogical "to exonerate the vessel from the liability imposed upon the ship, her tackle, etc., to satisfy seamen's wages and contracts entered into in good faith, for no other reason than the alleged separate ownership of the vessel and material." *The Edwin Post*, 11 F. at 606. In our case, of course, the Plaintiffs extended credit to the Vessel against the backdrop of the established maritime-law "principle that the legitimate expectations of a maritime lienholder as to the property standing as security for the debt *should be enforced*." *Chris Way MacMillan*, 890 F. Supp. at 562 (emphasis added). The Defendants then failed to pay what they owed the Plaintiffs for the goods and services the Plaintiffs provided *on credit*. We cannot—and, sitting as we are in equity, will not—allow the Defendants to shield themselves from these liabilities by hiding their assets in the individual, rather than the corporate, owner's name.

Holding on, the Defendants advance one final argument—that the Court has (unwittingly) already ruled that the paintings *aren't* appurtenances. *See* Motion at 8 (contending that the Court has already decided that the artwork "should not be part of the ongoing efforts to auction the Vessel" (emphasis omitted)). This is absolute frivolity. As Rybovich rightly explains, "[t]he Court's decision to sell the property under arrest separately was made to obtain the most money for plaintiffs. Selling the artwork attached to the vessel was unlikely to produce as much money as separating the artwork from the vessel and selling it separately." Response at 2. From the beginning of this case, it was this Court's view that the parties could get more money by selling the various components—the Vessel, the tenders, and the artwork—separately. That view was based on sound economic principles. *Cf.* Alexander Chernev, *Customers Will Pay More for Less*, HARV. BUS. REV. (June 2012),

https://hbr.org/2012/06/customers-will-pay-more-for-less (discussing research finding that customers "shown the bundle were willing to pay less than those shown the more expensive product alone"). But here's the point: whether we were right about the economics or not, we never meant to suggest that—by selling the items separately—we were resolving, conclusively or otherwise, the artwork's status as personal property.

*\*\*\**

For all these reasons, we hereby **ORDER and ADJUDGE** that the Motion to Separate the Artwork as a Non-Appurtenance [ECF No. 187] is **DENIED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 29th day of November 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: Counsel of Record